Good afternoon, I'm Justice Aurelia Puchinski and you are in the First District First Division of the Illinois Appellate Court. Today we are hearing case number 1-21-1668 APS Holmes Group, LLC Accounting Practices Sales v. Samuel Sorkin. Our normal routine in the Zoom or else we give you, you know, 10-15 minutes to get to the high points of your case and then, you know, within that time we'll be asking you questions and then, of course, the appellant always has time to reserve some time for rebuttal. I'll just tell you straight out, we've read the briefs, we've read the record, so we're familiar with the issues in this case and we always urge people to start with your best points. With that, I'll ask you to introduce yourselves, please. Good afternoon, Your Honors. Kevin McCormick on behalf of the appellant, Samuel Sorkin. Okay. And Doug Garmager on behalf of the Appellate APS Holmes Group, LLC. Thank you. Mr. McCormick, please. Thank you, Justice Puchinski. I'd like to reserve six minutes of time for rebuttal, if I can. Sure. This case is all about expectations and specifically the expectations that were defined by the brokerage agreement between APS and Mr. Sorkin. Now, Mr. Sorkin's expectations were to supply information to the broker, exclusively use APS to market and sell his practice, refer all potential purchasers to APS, meet with those purchasers and hopefully close on a sale. APS similarly had expectations to market the practice for sale, to locate prospective purchasers and vet them for Mr. Sorkin. And again, same end goal, to close on a sale to practice. Isn't the real issue here, question of whether there is an objective event? That is a critical issue. It's very critical, isn't it? I mean, it is. Yeah. I mean, doesn't that go to the heart of it? It does. In the heart of it comes to the fact that we're talking about paragraph four of the agreement, which refers to the cancellation provision. Specifically, it provides that... I know what it provides, but let me ask you a question. Please define for me, under Illinois law, an objective event. Well, an objective event is one in which it occurs and we can equally define it as we look at it. It's not left for subjective analysis where the parties can dispute what it is. I'm not understanding that because you've used the term in the definition. Well, let me ask it this way then. If both parties had to agree, mutual agreement to terminate, is that an objective event? Both parties agree to terminate the agreement. They have to agree. Both parties have to agree. If one says and the other says no, it's not an objective event. I would say it is. That's a binary thing. Either they both agree or they don't. Well, if they don't, it's an indefinite period, right? Correct. We can't have that. Correct. In this case, instead of both agreeing, one party, it says in paragraph four about one party, it doesn't mention anything about the other party. If the other party terminates, why isn't that fine? What is objective? What is indefinite? Let me put it this way. What is indefinite where your client could just continue renewing for every 15-day period? The contract by its terms didn't require anybody to do anything for it. Right. This contract would mean that APS would have to represent your client for the next 50 years. If they've ever sold it and there was no termination, this could go on forever, right? It could. Then we have an indefinite event, right? We do, except for the fact that we have a specific provision that identifies how the agreement can be canceled. No, but that's what the issue here is, right? We have to interpret this contract. You would agree with that. The court interprets this contract. We have to decide, did the court correctly interpret the contract or not? You say they didn't. Well, first and foremost, the court didn't interpret the agreement in any way, shape, or form. The judgment by the circuit court didn't take into account anything as it relates to the agreement and whether or not the cancellation provision was a one-sided cancellation provision and that APS forfeited its fee. That wasn't even decided in the summary judgment hearing. It's not in the judgment of the circuit court at all. Going back to my question, if your client could just sit there and do nothing, then it's an indefinite period. You agree or disagree? I would agree that the contract by its terms would continue to... It had an evergreen provision. It would continue to persist. Okay, and under Illinois law, that is frowned on, correct? It is frowned on. Okay, so why do we rule in your favor? Because while it's frowned on, it's not impermissible. More importantly, in this specific instance, APS had every opportunity to give itself the right to cancel the agreement, and it chose not to. No, but it did because it didn't say it didn't. It's not like the agreement in Buford. It's actually, they learned something from Buford, didn't they? So they took out that one sentence. You said it's substantially similar, identical, something like that. But there is a big difference, and that's that one line where they gave up their right, which they didn't do here. Well, I would disagree with you, Justice Hyman, in as much as in Buford, it said that they could cancel if there was a material breach. We're not talking about a material breach here. This is an ability to cancel the contract at any whim or for no reason whatsoever. Which is an agreement at will, which is what happens when it's an indefinite contract, impermissible, I mean, it's terminable at will. Right. Except for in here where you have specific language that's defining that one party has given up its right. They didn't give up their right. There's not a sentence here that says they give up their right. Where is that sentence? Well, reading that sentence into the agreement then renders the provision of paragraph four completely superfluous. What provision is that? Well, if the language saying that Mr. Sorkin had the right to cancel, he was given the exclusive right to cancel, by saying that either party could cancel at any time, we're writing that out of the agreement altogether. And that was the benefit of the bargain between these parties. Specifically, Mr. Sorkin knew that he would be bound to have to pay a fee for three years after the contract was terminated in the event that he sold the practice to somebody who was identified by APS. And so by giving up that right, by having to sit there for three years, he was given the exclusive right to cancel whenever he chose to do so. That was the benefit. And otherwise, APS had to work for him for 50 years. And he also wouldn't be able to sell his practice. He was equally bound to them. Well, then it doesn't make sense, the provision that, if they left, there's a provision that says if Mr. Sorkin has an agreement with somebody they brought to the table, and there was something happened during the period of time, then they get their 10%, which is what they're claiming, that it's terminated and Mr. Sorkin then did business with a party that they brought to the table. That's correct. But I would like to make one distinction here. The agreement says that if any purchase occurs during the term of the agreement, so while the agreement is in effect, doesn't matter where Mr. Sorkin procures that sale from, APS is entitled to a fee, which is distinguished from the time period after the agreement's terminated. So, if Mr. Sorkin was continued to be bound by the agreement, he could have gone out, found his own buyer, and would have still owed a fee, irrespective of whether or not APS assisted in bringing that party to the table in any way, shape, or form, which is distinguishable from post-termination, which said within three years after the contract is terminated, then a fee is owed only if that party was brought to the table by APS. And so, that does give us a distinction that this right to cancel was an exclusive right that was negotiated by the parties and given to Mr. Sorkin, because he couldn't sell no matter what would happen while the agreement was still in place. I don't know if Your Honor has had a further question on that, or if you want me to get more on that. Sure, go ahead. I appreciate that. Now, to that point, APS was not a novice business broker. It specifically identifies itself as the global leader in practice sales. That's on the top of its agreement. It claims to have done this time and time again. They held the power to define the terms of that agreement. And so, if they learned something from the Buford case, it would be that they would want to put in language that would give them an out, instead of relying on an implied interpretation of the contract. Here, we specifically have language granting Mr. Sorkin the exclusive right to cancel. And that exclusive right is set forth in paragraph four. And there is a distinction, a difference between a sale that occurs before termination and after termination. And that benefit of the bargain was negotiated. And the fact that APS sought to terminate the agreement while it had no right to do so was material, and it was a material breach. There was a further material breach, I'd like to point out, as it relates to the unwillingness to perform on the agreement, which was another issue that the Circuit Court never addressed or dealt with in its ruling on the summary judgment. Prior to the attempt to terminate the agreement, APS refused to broker the deal. Again, APS was the exclusive... Wait, what do you mean by they refused to broker the deal? I mean, they weren't going to be dictated by their client under the agreement. They didn't have to send out another invitation for a quote, right? I mean, that was, they didn't feel that that was appropriate. I mean, you're saying that they have to do something they feel is inappropriate? I'm not saying that. They were asked by their customer, Mr. Sorkin, to obtain highest and best offers, and they refused to do that. No, they did that. They sent out the letters, they got the results, and my understanding, tell me if I'm wrong, Mr. Sorkin asked them to do it again. He wanted to get the bidders competing against one another in that manner, and they said that that was not appropriate. They had previously received offers from other parties. None of which Mr. Sorkin had wanted to move forward with, and instead, he moved forward with another party. That deal fell through due to circumstances that Mr. Sorkin and APS had a disagreeing view on what was the end goal there. And so, after that sale transaction fell through, they re-engaged in trying to broker the deal. So, the moment that a prospective buyer was identified, there was no further negotiation with any other parties. And then it was reinstated after the original deal fell through. And when this is reinstated, Mr. Sorkin identifies three parties that he was most interested in and asks his broker to go and get highest and best offers from those three parties. But those three parties had already submitted offers, right? They submitted offers significantly prior to when this other failed sale had occurred. What do you mean by significantly prior? It was several months prior to when this failed sale occurred. So, there was an initial buyer who was identified, then there was draft contracts back and forth, negotiations between the parties, and that sale was about to go to a closing and then the closing fell through. And then these other buyers, prior offerers, were then reintroduced into the brokerage of the practice. So, they'd already given letters of intent with their offers? Correct. Did I understand you right that Mr. Sorkin, at that point, went out and found his own potential buyer? How did he find that buyer? That wasn't through APS? After the termination is when... Not prior to the termination. No, Mr. Sorkin did not go out and find a buyer before termination. Which termination are you talking about? The one that APS emailed him and said, this is over? Correct. So, Mr. Sorkin himself never said to APS, I don't need you anymore? Correct. So, as far as we know, APS is still representing him, is that correct? Because it's never been terminated, ever? Well, if the interpretation of the agreement is that it can be terminated at will, then the termination by APS... No, I'm trying to figure out what you're saying. You're saying that since Mr. Sorkin himself did not say to APS, I'm done with you, go away, I'm terminating, that APS still represents him? That's not what I'm saying. That's what I'm hearing because he's the only one who could terminate it and he never terminated it. I would agree that our interpretation of the agreement is that only Mr. Sorkin could cancel the agreement by its expressed terms. And he's never done that. He accepted the termination. Oh, okay. From APS. All right. Okay, he accepted the termination. Okay. So, at that point, when APS sent him the email, he didn't say, heck no, you have no right to do this, I'm still your client, do your best for me. He just went along with the termination. He accepted their termination of the agreement, which terminated the agreement in its entirety. Okay, so, thank you. Well, not in its entirety because there's a provision regarding three years after termination. There is a provision that does refer to that. The question becomes is whether or not the termination of the agreement by APS retained the ability to receive a performance fee. I agree, that's why we're here, yes. It is. You're correct, Justice. Justice Kavanaugh, I don't know if I... I know we had a pending question while you were... I don't know if I fully answered that for you. You did, thank you. Forfeiture is what was discussed below, but it was never resolved by the circuit court. The circuit court instead focused its entirety of the judgment on a completely different topic, which didn't address any of these specific issues. As you know, we can affirm on any basis in the record, right? That is correct, that is correct. But it is, nevertheless, an issue with the judgment that we've identified. Because this was in a grant of summary judgment, this court reviews this de novo, and we're seeking a de novo review, and a finding that the agreement, as it was terminated, resulted in a forfeiture, and that the prior refusal to perform resulted in a forfeiture of that fee. Unless any of you justices have any further questions, I have nothing further than I reserve my remaining time for rebuttal. Anyone? Okay, Mr. Garmin. Thank you, Your Honor. This case is really just about Mr. Sorkin claiming that my client, APS, a business broker, has forfeited his contractual right to a performance fee after APS had successfully marketed Mr. Sorkin's accounting practice to thousands of potential purchasers, and ultimately procured the buyer of his accounting practice. So why didn't your client protect themselves in the agreement? Well, I believe that my client did protect himself. As we all know, there's a backdrop of Illinois contract law that specifies that contracts of indefinite duration, such as the one here, which, like you mentioned, Justice Hyman, it could go on in perpetuity. There's nothing that puts an end to this contract under the section four term of the agreement. And contracts of indefinite duration, the general standard, based on Jesperson and cases that follow that, is that those contracts are terminable at the will of either party. And in light of that, if Mr. Sorkin's concern was that he should be able to terminate the contract because that my client should not be allowed to terminate the contract, it was really incumbent upon him to place language in the agreement that specifically prevented my client, APS, from terminating the agreement because that would have been a change or an overwriting of Illinois law, which we all know those contracts are drafted against that backdrop. And really, as far as Jesperson's concern, the general standard is contracts of indefinite duration are terminated at will. The only thing, Jesperson set out the circumstances that would take a contract out of that general rule of at-will termination. There has to be language in the contract that says it's only terminable for cause or that it's only terminable upon the occurrence of a specific event. We look at the contract here, it doesn't contain any of those indicia of a contract that would be taken out of the general rule of at-will termination. Contract here, like you've all read it, it says it shall automatically renew for consecutive 15-day periods until APS gives written notice of the intent to cancel. Mr. Sorkin acknowledged at page 16 of his response brief that this provision has all of the indicia of a contract of indefinite duration, and we agree. Compare it to the contract language in Jesperson, which the Supreme Court held was an at-will contract that said the contract shall continue in force indefinitely unless it's terminated in accordance with section four, which set forth various instances of breach in which a party could terminate the contract. And the main holding in Jesperson was that basically setting forth the ability to terminate a contract, general contract rights that allow somebody to terminate a contract do not take a contract out of the general rule of at-will termination. So for instance, if you identify, well, here's circumstances that would be a material breach that you could terminate a contract, or for instance here, where we have an at-will contract and you say one party has a right to give notice to terminate, those are rights that anybody has under the law to terminate a contract. That still keeps the contract within the general rule of at-will termination. And again, the contract here does not contain any of those indicia that Jesperson identified that would take the contract out of at-will termination. There's no language in there that states that it can only be terminated for cause or what Jesperson called an exclusive and specific right to terminate. Council, I have a question. So is this just bad drafting? The fact that this last sentence says the agreement shall automatically renew for consecutive 15 day periods until seller gives APS notice, should that have said seller or? I think you have to keep in mind that these are contracts that are written by ordinary people. I don't know if this contract was drafted with any attorney input, but these are contracts that people put out there. And all it does is it tells the client that this thing's going to continue and that APS, excuse me, that the seller has the right to cancel the contract. It doesn't take it away from the general rule of at-will termination under Illinois law. Like Justice Hyman said, otherwise my client's bound to be serving Mr. Sorkin in perpetuity for 10, 15, 20 years potentially without being able to get out of it. And so having that, again, Illinois just favors that type of scenario. So just merely telling somebody that they have a right to terminate the contract, which any party does in Illinois under a contract of indefinite duration, that as Jesperson recognized, that doesn't take the contract out of that general rule of at-will termination. And we can look at other cases too. I mean, we've, again, we cite the RJN Corp, the Conley- You would agree though, there's some bad drafting going on here. I think, yeah. Well, I don't know that I would say it's bad. I would say, you know- Unclear. Yeah, I guess potentially, but- Potentially unclear, obviously. I think what it is clear about though is that it's a contract of indefinite duration. And I don't think that there's any ambiguity or problems that would take the contract out of that general rule of at-will termination. Because, you know, Mr. Sorkin talks about, you know, expectations, that it was his expectation that, you know, he could terminate this con- That only he could terminate the contract. You know, frankly, that doesn't really hold much water in this case because right after my client terminated, as Mr. McCormick referenced, his client accepted the termination and sent correspondence to my client acknowledging his right to a performance fee specifically. So this idea that he didn't think my client could terminate the contract and obtain a performance fee is directly contradicted by his own statements, which are in the record, 492 and 533 in the record. You can find his correspondence to that effect. Yeah, but I mean, basically, bottom line is that if this contract considered otherwise, wouldn't we be saying that Mr. Sorkin could easily at any time have been able to collect, I mean, if, well, I guess what he's saying is by accepting it, then he wasn't required to pay the 10%. That's his contention. He says, you breached, he didn't have to pay the 10%, but that's what the paragraph four, I believe it is, says otherwise, right? Correct. I think, you know, when you compare paragraphs two and paragraph four, again, we have a contract of indefinite duration. It advises of like, again, anybody has a right under Illinois to terminate a contract of indefinite duration. It just simply provides that one party does have that right, doesn't restrict or take away any other party's right to terminate, including APS. And section two specifically contemplates what happens in the event of a termination. Again, my client, the records, it's undisputed in the record. He went out of his way. He put in all the time and effort to sell this accounting practice. He contacted thousands of purchasers. He got multiple letters. Let me ask another question. Would it have mattered if hypothetically the sentence saying that the seller can terminate at any time? We're not there. Wouldn't the same result that Judge Snyder ruled apply? So if you say that the seller can terminate at any time, or you don't say the seller can terminate at any time, the result would be the same. I would agree with that because again, the key aspect of this is whether it's a contract of indefinite duration. And I think everybody agrees that it is because- Well, not everybody, but- Well, I'm not really sure. I don't know if I'll let counsel speak. I would exclude Mr. McCormick from that. I'm just saying. I will. I'll just refer to page 16 of his response brief, where he at least acknowledges that it contains all of the elements of a contract of indefinite duration. And in my view, it appears that point was conceded. In any event though, it does say it shall automatically renew for consecutive 15-day periods. That goes on into perpetuity taken to its logical end. And so yeah, section two of the agreement specifically identifies that if the contract is terminated, there's three years during which if Mr. Sorkin sells his practice to anybody that my client APS had procured as a purchaser or as a contact, then the performance fee is owed. So taken as a whole, this contract contemplates this very situation where a party terminates and my clients put in all of the work and the effort to procure the purchaser of the business. And what happens in that scenario, which is that my client gets that 10% performance fee, because that's all of the work that my client put in to procure that purchaser. That's what his job was. What he's hired to do was to market this practice, bring buyers to the table. It's undisputed that section two, that all of the prerequisites to a performance fee have been met here. The only real issue is whether or not my client had a right to terminate, which we believe it absolutely did under the law. And I think Judge Hyman, you mentioned, Justice Hyman, you mentioned that the Burford case and how that case, I think that case provides a very helpful contrast to Jesperson, RGN Corp in this case, where it specifically says in there that the defendant cannot terminate the contract unless it's violated by the plaintiff. And the court found that that particular language was the clear statement Jesperson requires in order to take the contract out of the general rule of at-will termination, because it specifically prevents, it expressly prevents a party from terminating the contract. And there's no such limiting language in this contract whatsoever. Mr. McCormick will not be able to point you to anything in this contract that says my client cannot terminate the agreement. And at the end of the day, this case I think is about Mr. Sorkin kind of looking for a free lunch. My client put in all the work, contacted purchasers, advertised the business, brought the purchasers to the table. He did everything he was required to do under the contract. Mr. Sorkin, he took advantage of that. As soon as my client terminated, he sold his practice to one of those purchasers that my client brought to the table and then did not want to pay his performance fee. Okay. So let's go back to Mr. McCormick's sort of theory that because Mr. Sorkin didn't terminate the contract, it's not terminated, even though he accepted the termination. Let's just assume for a minute that we believe that it was never terminated. It's still in effect.  Correct. Yes, I believe that that would be the case. And, you know, turning to Mr. Sorkin's other argument about the lack of performance in this case that my client somehow didn't perform. Frankly, I don't think that they've identified any contract provision that my client's breached whatsoever. And I think the best evidence that my client did perform under the contract was that he brought the purchaser that Mr. Sorkin sold his practice to to the table. I think it's kind of hard for him to criticize my client for not performing under the contract when he sold his practice and made money off of the purchaser that my client brought to the table. And another thing that's kind of raised in his brief is that my client was somehow required to personally sell the practice. There's no contract, there's no provision in the contract that requires that. And again, looking at section two, the contract expressly contemplates that there's a termination and that a sale happens after the contract's been terminated. So it would be illogical for my client to actually have to sell the practice if he's entitled to performance fee even after a termination of the contract. And there's several other arguments that are raised by Mr. Sorkin. I'm happy to address the Business Brokers Act if anybody has any questions, but I do think those are adequately addressed by the brief. And unless anyone has any other questions about the contract issues, I'll end here. And we just ask that the court affirm the judgment of the circuit court and also remand us for instructions to allow us to file a fee petition for our attorney's fees under the contract in the circuit court. Any other questions? Mr. McCormick. Thank you, Justice Pachinksi. The first regard is section two that counsel was referring to of the contract and that a termination of the agreement results in the payment of a fee. And not every termination of the agreement results in a fee because that could lead to absurd results. If there was a material breach of the agreement by APS, which terminated the agreement, there would be no claim by APS to that performance fee if there was a sale afterwards. So the fact that there was a termination of the agreement in and of itself doesn't mean that APS was entitled 100% of the time to a performance fee. The other issue goes back to the benefit of the bargain here, which is that during the term of this agreement, any purchaser who came, whether or not it was procured by APS, would result in the payment of a fee. And while this is going on, you heard counsel refer to the fact that thousands of prospective purchasers were introduced to Mr. Sorkin through this process, which meant that for a three-year period of time, Mr. Sorkin knew that after he canceled the agreement, thousands of purchasers were unavailable to him. Well, they were available, he just had to pay the 10%. I mean, this is, as you know, it's typical in these types of agreements, real estate agreements have them all the time. I mean, it is the way business is operated. And I'd like to hear what you have to say about his free lunch argument. Well, I think the free lunch argument, unfortunately, is an equitable argument that's being raised that is claiming that there's some type of unjust enrichment that is occurring here, except for the fact that the equitable claims that were brought in this case were non-suited prior to any summary judgment being entered. They weren't argued at all as part of the judgment of the trial court, and they're not at issue here on appeal. So making that argument, I believe that APS has waived its ability to argue that there was some type of free lunch because that's an equitable argument on their behalf of saying that there was something that was unjustly retained by Mr. Sorkin in the events of what happened here. And I don't think it's appropriate that that argument- You're not saying that that didn't happen. You're just saying that they can't raise it. Is that what you're telling us? I think that the argument that there was a free lunch is an equitable argument because that's claiming that he got something for which an equal benefit or a collateral benefit was not received by APS. Well, that is what happened, isn't it? I would disagree with you, Justice Coghlan. The events of this transaction were that the contract was terminated. And so Mr. Sorkin believed that the contract was terminated and his obligation to pay a fee was taken away because as he understood the contract, only he held the right to cancel the agreement. And so when APS went outside of the bounds of the agreement and canceled it, it terminated the whole agreement. So at that point, he was free to sell his practice to whomever he chose to sell it to. If the panel has any other questions, I can address those. Otherwise, we'd ask for the judgment of the circuit court to be reversed and for summary judgment to be entered in favor of Mr. Sorkin. Any other questions? All right. And thank you, gentlemen. We have appreciated your fine arguments and your fine briefs. We'll take this case under advisement and issue a ruling forthwith. This matter is closed, and this court is in recess until our next oral argument at 2 o'clock.